FILED
U.S. DISTRICT COURT
SAVANNAH DIV.

# UNITED STATES DISTRICT COURT

□□ OCT -3 PM 4: 17

# SOUTHERN DISTRICT OF GEORGIA



# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. CR407-126 |
| | ) | |
| PETER J. MITCHELL, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Defendant Peter Mitchell, who is charged with the receipt and possession of numerous electronic images of child pornography, has moved to suppress the evidence acquired by the government as a result of the seizure and search of his computer hard drive. Doc. 20. Mitchell contends that the warrantless seizure of the hard drive from his home computer violated the Fourth Amendment protection against unreasonable searches and seizures. He further contends that even if the initial seizure was lawful, the agents acted unreasonably in waiting three weeks before applying for a warrant authorizing a search of the hard drive. The

government opposes defendant's motion. Doc. 23. The Court conducted an evidentiary hearing on July 11, 2007 and granted the parties additional time to submit post-hearing briefs. Those briefs have been received and the matter is now before the Court for consideration. Docs. 30, 34. For the following reasons, defendant's motion should be denied.

## I. BACKGROUND

The facts material to the resolution of defendant's motion to suppress are largely undisputed.[1] Prior to 2006, Immigration and Customs Enforcement (ICE) agents in New Jersey, under the direction of the United States Attorney in that district, began an investigation of individuals engaged in distributing and receiving child pornography by means of the Internet. In October 2005 the ICE agents located a commercial website labeling itself "Illegal CP."[2] The banner page (which appears when the

---

[1] The Court's findings of fact are drawn from the testimony of Immigration and Customs Enforcement Special Agent Thomas West, the only witness to testify at the suppression hearing, and the exhibits attached to defendant's original motion to suppress (which include the agents' investigative reports and related materials furnished by the government during discovery and the affidavit offered in support of the government's application for a search warrant). Doc. 20, Exs. 1-10.

[2] Agent West testified that "CP" is a commonly used abbreviation for child pornography in the CP "community." Transcript of Suppression Hearing (doc. 27, hereinafter "Tr.") at 93.

website is first accessed) featured more than a dozen images of minors engaged in sexual acts with other minors or adults. The banner page proclaimed that "NOW YOU ARE [A] FEW MINUTES AWAY FROM THE BEST CHILDREN PORN SITE ON THE NET!" and contained a testimonial from a self-described pedophile praising the website. Doc. 20, Ex. 9 at 11. An ICE agent purchased access to the website for the sum of $79.99, which was billed to his credit card as a charge to "AdSoft," an Internet bill-payment service. Id. at 12. Upon entering the website, the agent was greeted with a notice that "Our site is considered to be illegal in all countries . . . ." Id. ICE agents then located thousands of images of child pornography on the website, including images of prepubescent females engaged in sexual acts with adults. After securing search warrants and a wiretap order, the agents identified hundreds of individual subscribers who had visited the website during various periods from October 2005 through February 2006. Doc. 20, Ex. 9.

Among the many suspects identified during their investigation, the agents determined that a credit card belonging to Peter Jack Mitchell, a resident at 171 Yam Gandy Road, Savannah, Georgia, had been charged

$79.99 by AdSoft on October 14, 2005. The investigators learned that the Illegal CP website offered new subscribers a twenty-day subscription to the website for $79.99, which was the same fee charged to the ICE agent who had purchased access to the site as part of his investigation.

In May 2006, the New Jersey agents forwarded this information to the ICE office in Savannah, which commenced an investigation of Mitchell as a possible subscriber to the Illegal CP website. The agents determined that Mitchell had incurred an additional $79.99 charge to AdSoft on his credit card on June 14, 2006, but they lacked any proof that the AdSoft charges on Mitchell's credit card were specifically for the targeted website.[3] Tr. at 7. The agents, in consultation with the local U.S. Attorney's Office, concluded that they lacked probable cause to apply for a search warrant for Mitchell's residence and computer. Id. at 7, 31, 98.

At around 11:00 a.m. on February 22, 2007, ICE Special Agent Thomas West and FBI Special Agent Josh Hayes went to Mitchell's

---

[3]In addition to processing bill payments for the Illegal CP website, AdSoft processes Internet payment transactions for other, legitimate online vendors as well. Thus, Mitchell's $79.99 charge to AdSoft was "consistent with," but not conclusive evidence of, the purchase of a subscription to the Illegal CP website. Tr. at 7, 95, 99.

residence at The Landings[4] for the purpose of conducting a "knock and talk," a law enforcement investigative procedure whereby agents seek the consent of a homeowner to conduct an interview at his residence. Tr. at 8. When Mitchell answered the agents' knock on the front door of his residence, the agents identified themselves and asked if they could come inside and speak to him about an investigation they were conducting. Id. Mitchell invited the agents into the residence and led them to his living room. Id. The agents explained that they were conducting an Internet child pornography investigation and inquired whether Mitchell had purchased subscriptions to any pornography websites. Id. at 10. Mitchell responded that he had purchased subscriptions to an adult pornography website and a "teen website." Id. Mitchell acknowledged that there were two computers in his residence, one located downstairs which he primarily used and a laptop located in the upstairs bonus room that his wife used. Id. When asked whether any of the computers in his residence contained any "illegal contraband," Mitchell responded "Yes, probably." Id. Agent West then specifically asked if any of the computers contained any child

_____

[4]The Landings is an affluent, gated community located in Chatham County, Georgia.

pornography. Mitchell again responded "Yes, probably."[5] Id.

Mitchell, who was cordial and cooperative throughout the encounter, consented to a search of the laptop computer located upstairs and executed a "Consent to Search" form furnished by the agents. Doc. 20, Ex. 7. Mitchell, however, refused to consent to a search of the downstairs computer. Mitchell then escorted the agents to the bonus room, where Agent West conducted a forensic examination of the laptop's hard drive, a procedure that took some fifteen minutes. Tr. at 13, 62. West determined that the hard drive contained no child pornography. Id. at 13. He then asked if Mitchell would allow the agents to see his other computer. Mitchell assented to this request and led the agents to a downstairs office where the desktop computer was located. Id. at 13–14. Agent West asked if this was the computer that contained the child pornography, and Mitchell stated

---

[5]There is some uncertainty in the record as to Mitchell's exact response to the agent's question regarding whether Mitchell had purchased subscriptions to any pornography websites. While Agent West's investigative notes reflect that Mitchell acknowledged purchasing memberships "to an adult pornography website and a teen website," doc. 20, ex. 5, West testified that Mitchell indicated that he subscribed to two teen websites or, more precisely, that he had "two adult pornography subscriptions that consisted of teens." Tr. at 10, 72. When questioned about this discrepancy, Agent West conceded that his notes were likely accurate. Id. at 73. The agent further volunteered that at one point Mitchell stated that he had not subscribed to a child pornography website. Id. at 72, 73. The agent, however, never wavered from his testimony that Mitchell stated "Yes, probably" when specifically asked whether there was child pornography and illegal contraband on his computer. Id. at 10, 63, 73, 92-93.

that it was. Id. at 14, 92-93. West then advised Mitchell that given his admissions that there was child pornography stored on the computer, the agents were going to seize the computer's hard drive. Id. at 14. The agents removed the hard drive and departed the residence at 12:00 p.m., approximately one hour after their arrival. Agent West transported the hard drive to the local ICE office, where he logged it into evidence and placed it in the evidence vault.

On February 25, 2007—the Sunday following the Thursday seizure of the hard drive—Agent West traveled to Virginia to attend a two-week ICE training course related to recovering evidence from computers. During the evening hours, he began to draft an affidavit in support of a warrant application to search the hard drive seized from Mitchell's computer. Id. at 18–19, 94-95. Upon his return to Savannah, the agent met with Assistant United States Attorney Stephen Marsh, who assisted in the final draft of the affidavit. Id. at 19.

On March 15, 2007, the government presented its application for a warrant to search the hard drive that had been seized twenty-one days earlier. The Court issued the warrant that same day. After securing the

warrant, Agent West for the first time accessed the information stored on the hard drive. Because of the large volume of pornographic images located on the device,[6] it took West some two weeks to complete his forensic examination. Id. at 86-87. Agent West testified that he is frequently called upon by the FBI and other federal law enforcement agencies to conduct forensic examinations of seized computers because he can perform that task locally and much faster than through normal channels. Id. at 20-22, 26. He further testified that even if a warrant had been obtained prior to his departure for Virginia, the search of the hard drive would not have begun until his return from the training course, for he was the only local federal agent with the necessary skills to perform that task. Id. at 18–20. Had the hard drive been forwarded to the FBI Computer Analysis Response Team (or CART), it could have taken up to a year or more for a CART examiner to conduct the search because of the FBI's huge backlog. Id. at 20-22.

## II.   ANALYSIS

Defendant contends that the agents violated his Fourth Amendment

---

[6]There were nearly 20,000 images on the hard drive, the majority of which constituted child pornography. These images included 85 video files and over 500 still pictures of individuals known to be minors engaged in sexually explicit conduct. Tr. at 91.

rights when they seized the hard drive from his home computer after he had specifically refused to give them consent to search that computer. He further contends that a separate violation of the Fourth Amendment occurred when the agents retained the hard drive for three weeks before applying for a warrant to search a storage device that contained his private records and emails.

The government responds that the warrantless seizure of the hard drive was proper since, after being invited into defendant's home, the agents were given "plain view" access to a computer that defendant freely acknowledged contained images of child pornography, a form of contraband evidence that could be easily altered or erased before a warrant could be obtained. The government next argues that no warrant was needed for the agents to retain a hard drive containing admitted contraband and that, in any event, the agents acted reasonably in waiting three weeks to secure a warrant to search the computer hard drive.

## A.    Initial Seizure of the Hard Drive

Mitchell challenges the government's reliance upon the "plain view" doctrine by arguing that the evidence offered at the suppression hearing

fails to establish (1) that the incriminating nature of the computer hard drive was "immediately apparent" to the agents, or (2) that there were "exigent circumstances" justifying the warrantless seizure of the hard drive. Doc. 30, at 14. Mitchell implies that both of these factors are key elements of the plain view doctrine. Mitchell's first contention is factually unsupported by the record, and his interpretation of the plain view doctrine is unsound as a matter of law.

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971) (plurality opinion). Subsequent Supreme Court and lower court decisions have further defined the "plain view" doctrine as permitting the warrantless seizure of private possessions where two essential requirements are met: (1) the officer is lawfully in a position to view and access the object, and (2) the incriminatory character of the object is "immediately apparent." Horton v. California, 496 U.S. 128, 136-37 (1990); United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006); see Texas v. Brown, 460 U.S. 730, 737 (1983) (plurality opinion) (referencing an additional requirement that the officer discover the

incriminating evidence "inadvertently," a "plain view" element that the Court later abandoned in <u>Horton</u>). In this case, the first element is clearly satisfied, for there is no evidence that the agents violated the Fourth Amendment by either viewing Mitchell's computer or entering the area where the computer was located. The testimony establishes that Mitchell not only invited the agents into his home but permitted them to enter the office where he kept his desktop computer. Thus, the agents had a lawful right of access to Mitchell's computer, a point which he does not seriously contest.[7]

The second prong of the plain view doctrine requires the Court to determine whether it was "immediately apparent" to the agents that Mitchell's computer hard drive contained evidence of child pornography. The Supreme Court has since made clear that this term—initially used by

---

[7]At one point, Mitchell does refer to <u>Arizona v. Hicks</u>, 480 U.S. 321 (1987), where police officers who lawfully entered a residence from which a weapon had been fired noticed some expensive stereo equipment and moved some of the components to reveal the serial numbers, which revealed that the equipment was stolen. The Court determined that the seizure of the stereo equipment could not be justified under the plain view doctrine even though the police were lawfully on the premises, for they acquired probable cause only upon their moving of the equipment (which constituted an unlawful search). <u>Id.</u> at 328-29. <u>Hicks</u> has no application to this case, since the agents developed probable cause to believe that Mitchell's computer contained child pornography prior to touching the computer or conducting any type of search.

the Coolidge plurality—should not be interpreted as implying "that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." Brown, 460 U.S. at 741. Rather, as many courts have held, the "immediately apparent" component of the plain view doctrine requires only that the officers have probable cause to believe that the object they are viewing is contraband or evidence of a crime. Id. at 741-42; Hicks, 480 U.S. at 326; Smith, 459 F.3d at 1290, 1291;[8] see 3 Wayne R. LaFave, Search and Seizure § 6.7 (a), at 481 & n.7 (4th ed. 2004).

Mitchell suggests that his "contradictory" and "equivocal" responses to the agent's inquiries did not make it "immediately apparent, *without any*

---

[8]In Smith, agents conducting a warrant search for drugs opened a lockbox that contained numerous photographs, some of which depicted what appeared to be "'very, very young girls'" having sex with a male later identified as defendant. 459 F.3d at 1281. The Eleventh Circuit rejected defendant's contention that it was not "immediately apparent" to the officers that the photos were evidence of child pornography because the age of the girls was unknown, there was no evidence that the photos had been "produced" by defendant or had traveled in interstate commerce as required by the relevant statute, and the officers did not examine each of the 1,768 photos before seizing the lot. The court reasoned that the defendant was proposing too exacting a standard, and that the proper test was whether the officers had "probable cause" to believe that some of the girls depicted in the photos were under 18. Id. at 1291. Since the officers reasonably believed that the girls were minors, it was not necessary for them "to have been correct in their assessment," id., or "'to know with absolute certainty'" that all of the elements of the federal child pornography statute were satisfied when they made their seizure. Id. at 1292 (citation omitted).

*need for further investigation,* that the object was incriminating in nature."

Doc. 30 at 15, 16 (emphasis added). This contention misconstrues the plain view doctrine's "immediately apparent" component by demanding conclusive proof, rather than simple probable cause, that the seized object is associated with criminal activity. A showing of probable cause does not rule out the need for further investigation in order to confirm the incriminatory character of the seized evidence. As the Supreme Court has noted many times, "probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." Brown, 460 U.S. at 742 (citations omitted). Mitchell is endeavoring to impose the unduly-high-degree-of-certainty standard that the Court specifically rejected in Brown. Id.

Mitchell's contention that the agents lacked probable cause to believe that his computer hard drive contained images of child pornography rests upon a strained (if not tortured) reading of the evidence. When the agents

arrived at Mitchell's residence they knew that his credit card had been used by someone on the premises to incur a $79.99 charge to AdSoft, which was consistent with the purchase of a subscription to the Illegal CP website. After inviting the agents into his residence, Mitchell denied having a subscription to a child pornography website but freely admitted that he had purchased subscriptions to two adult pornography websites that consisted of teens. When asked directly whether any of the computers in his home contained any "illegal" content or contraband, Mitchell responded "Yes, probably." Tr. 10, 73. The agent then pointedly asked Mitchell whether any "child pornography" would be on any of his computers, and Mitchell once again stated "Yes, probably." Tr. 10, 93-94. Later, when given access to the office computer, the agent asked if that was the computer that contained the child pornography. Mitchell confirmed that it was. Tr. 11, 92-93. These are not "equivocal" statements.[9] Quite the contrary, they are

---

[9]Nor are they necessarily "contradictory." The fact that Mitchell initially disclaimed having a subscription to a child pornography website did not rule out the possibility that he had *previously* had a subscription (or that evidence of a discontinued subscription would still be on his computer). Further, even if Mitchell had never subscribed to a child pornography website, this would not exclude the possibility that he possessed images of child pornography on his computer, for such images may be acquired through online discussion groups, various file-sharing methods, and other means that do not involve purchasing subscriptions to websites.

clear admissions that Mitchell's office computer contained incriminating evidence stored on his hard drive. These admissions, coupled with Mitchell's use of AdSoft (the same electronic payment service used by the Illegal CP website) to incur a $79.99 charge (a charge identical to the price for a subscription to that child pornography website), clearly furnished probable cause that Mitchell's computer contained contraband images of child pornography.

Mitchell next suggests that an application of the plain view doctrine requires a further showing of "exigent circumstances" in addition to the lawful–intrusion and probable–cause elements discussed previously. Mitchell's argument rests upon a misinterpretation of Horton v. California, a case that offers no support for his position. Prior to Horton, the Supreme Court articulated the "three requirements" of the plain view doctrine as first defined by the Coolidge plurality. Brown, 460 U.S. at 737, 741-42 (identifying the plain-view requirements as lawful initial intrusion, inadvertent discovery, and plain view of evidence whose incriminatory character is immediately apparent). Horton specifically jettisoned the "inadvertence" element and, in effect, converted the plain view doctrine

into the two–element test discussed earlier. Despite Mitchell's argument to the contrary, Horton did not *add* a further requirement of "exigent circumstances." While Horton does refer to the Coolidge plurality's statement that "'plain view *alone* is never enough to justify the warrantless seizure of evidence,'" 496 U.S. at 136, that discussion appears in the context of what the police must possess in order to justify their entry into the premises or their gaining access to the seized object. Id. at 137 n.7. Nowhere in Horton or in any other opinion has the Supreme Court imposed "exigent circumstances" as an element of the plain view doctrine. As the Ninth Circuit has squarely held, where a police officer is lawfully present on the premises and the incriminatory character of the evidence is immediately apparent, "there is no additional requirement of exigency for the seizure of property that is in plain view." G&G Jewelry, Inc. v. City of Oakland, 989 F.2d 1093, 1100-01 (9th Cir. 1993). See Brown, 460 U.S. 737 n.3 (noting that the Coolidge language quoted by Mitchell "was merely a rephrasing of its conclusion . . . that in order for the plain view doctrine to apply, a police officer must be engaged in a lawful intrusion or must otherwise legitimately occupy the position affording him a 'plain view.'");

1 LaFave § 2.2(a), at 447 n.4; 3 LaFave § 6.7(a), at 481.[10]

As noted previously, both elements of the plain view doctrine are satisfied in this case: (1) the agents lawfully acquired access to Mitchell's computer, and (2) there was probable cause that Mitchell's computer stored images of child pornography. Federal agents with a lawful right of access to the place where contraband or a suspicious object is located in plain view "may seize it immediately." Brown, 460 U.S. at 739. They are not required to impound the residence while they secure a warrant to merely *seize* an object whose incriminating character is immediately apparent. 4 LaFave

---

[10]Of course, it could be argued that some form of exigency is inherent in most applications of the plain view doctrine, for an officer who encounters contraband or incriminating evidence while lawfully within a defendant's premises will generally risk the loss of that evidence if he delays its seizure. That is certainly the case here, for images or data stored on a computer suspected to contain child pornography may easily be deleted, damaged, or overwritten to the point that the data is unrecoverable. Tr. at 15-16, 28-30. That is not to say that exigency is a necessary concomitant of every plain view observation of incriminating evidence. For example, the sheer bulk or volume of that evidence may make its quick removal or destruction a practical impossibility, or an officer may observe some item whose incriminatory nature is known only to the police and, for that reason, is not likely to be destroyed while a warrant is sought. Although the issue is not presented in this case, the plain view doctrine would permit the immediate seizure of evidence in the above examples despite the absence of any inherent exigency. An officer who encounters evidence of a crime after lawfully entering a home or other premises does not offend the Fourth Amendment's reasonableness requirement by promptly seizing that evidence. Mitchell is simply wrong in arguing that some additional showing of exigency is required. But even if Mitchell was correct on this point, it would avail him nothing, for the ready destructibility of the electronic data stored on his computer hard drive required its immediate seizure in order to preserve the integrity of that data.

§ 6.5(c), at 415, 432. Accordingly, the seizure of Mitchell's computer hard drive did not violate his Fourth Amendment rights.

## B.     Delay in Securing a Warrant

Mitchell next contends that even if the initial seizure of the computer hard drive was justified, the agents' failure promptly to secure a warrant to search that storage device furnishes an alternative basis for suppression. While Mitchell concedes that the Fourth Amendment imposes no "bright-line" measure of reasonableness, he argues that the three-week delay between the seizure of the hard drive and the securing of a warrant to search that drive was "plainly unreasonable." Doc. 30, at 20.

Before addressing this contention, the Court must consider the government's initial counter argument that Mitchell's admission that his computer contained child pornography not only furnished probable cause for its seizure but effectively eliminated Mitchell's possessory interest in that property.   Accordingly, the government reasons, "no subsequent warrant was required in order to authorize its continued *retention* by law enforcement officials." Doc. 23, at 6 (emphasis added). A contrary holding

would require officers who lawfully seize cocaine without a warrant to seek judicial approval for its continued detention (or testing), which the government argues is not what the law requires. Thus, the government suggests that the delay in this case is of no constitutional significance, as the agents had no obligation to return admitted contraband.

This argument, the Court believes, ignores the difference between observing contraband or evidence of a crime in plain view and observing a container in plain view that an officer has good reason to believe conceals contraband or incriminating evidence. In the former situation an officer may seize and retain an item of property whose evidentiary value does not depend upon any further intrusion into the owner's privacy.[11] In the latter situation the government must open—i.e., *search*—the container before it can actually observe its contents and confirm their contraband or incriminatory nature. Thus, there is an important difference between an officer's lawful seizure of a pipe or cigar wrapper filled with a green leafy

_____

[11]In this context, it matters not whether the item is contraband which defendant cannot possess under any circumstances (such as illicit drugs or a photo depicting a child of tender years engaging in a sexual act) or mere evidence of a crime (such as a murder weapon or a recent photo of a known felon holding a firearm). If such contraband or incriminating evidence is in plain view (or is lawfully seized under some other exception to the warrant requirement) the item may be seized and retained by the police without any need for a subsequent warrant.

material that reeks of the distinctive odor of marijuana and his lawful seizure of a closed container or package alerted upon by a drug-sniffing dog. Although such an alert furnishes probable cause, a warrant is generally needed to open the closed container out of respect of the owner's privacy interest in such property. 3 LaFave § 5.5(c); id. § 6.7(b), at 489; see United States v. Place, 462 U.S. 696, 701-02 (1983). But no privacy interest is implicated as to an item whose incriminating nature is apparent on its face without any need for a further search of that property. Brown, 460 U.S. at 738. The cases routinely recognize this distinction.

Thus, the government's contention that Mitchell had no right to possess a computer that he admitted contained contraband begs the question of whether the government had a duty to secure a warrant to search that container within a reasonable time after its seizure.[12] The Court concludes that the government has such a duty upon its lawful

---

[12]The government equates Mitchell's admission that his computer contained child pornography with the plain view discovery of a photo of a young child engaged in sexual activity and suggests that the government can retain either item without judicial approval. While the government cites no case precisely on point, the Court does not doubt the general proposition that since no citizen has a right to possess contraband, the government is free to retain that property upon its seizure. This truism, however, does not resolve the question of whether the government was obligated to secure a warrant to search the computer within a reasonable time.

seizure of a container reasonably believed to contain criminal evidence, whether that probable-cause belief arises from a defendant's admission,[13] a dog sniff, or information derived from any other source. A defendant's possessory interest in his computer is diminished but not altogether eliminated by such an admission for two reasons: (1) a home computer's hard drive is likely to contain other, non-contraband information of exceptional value to its owner, and (2) until an agent examines the hard drive's contents, he cannot be certain that it actually contains child pornography, for a defendant who admits that his computer contains such images could be lying, factually mistaken, or wrong as a matter of law (by assuming that some image on the computer is unlawful when in fact it is not). See 3 LaFave § 5.5(f), at 259-60. Despite Mitchell's admission that there was "probably" child pornography and "illegal" content on his

---

[13]Some cases have given extraordinary weight to a defendant's admission that incriminating evidence is inside his closed container, concluding that such a statement is akin to "revealing the contents by using a transparent container," thereby permitting not only its seizure but its warrantless search as well. 3 LaFave § 5.5(f), at 259; id. § 6.7(b), at 490-91. "[T]hese cases suggest in general a willingness of courts to permit police to look within containers in plain view upon a high degree of certainty as to the contents." Id. § 6.7(b), at 491. None of these cases, however, has authorized the warrantless search of a *computer* based on an admission that it stores incriminating evidence, and as this issue has not been briefed by the parties, the Court is unwilling to wade into these waters.

computer, until the government actually examined the hard drive, it could not be certain that it contained evidence of a crime.

The purpose of securing a search warrant soon after a suspect is dispossessed of a closed container reasonably believed to contain contraband is to ensure its prompt return should the search reveal no such incriminating evidence, for in that event the government would be obligated to return the container (unless it had some other evidentiary value). In the ordinary case, the sooner the warrant issues, the sooner the property owner's possessory rights can be restored if the search reveals nothing incriminating. Thus there is good reason to insist upon an early search in order to protect whatever limited possessory rights remain in the property.

The seizure of Mitchell's hard drive certainly implicated his possessory interest in that property. United States v. Jacobsen, 466 U.S. 109, 113 & n.5 (1984) (describing the seizure of property as "some meaningful interference with an individual's possessory interests in that property"). That seizure did not intrude upon Mitchell's privacy interest, however, for agents did not examine its contents until after securing a

warrant. Nor did the seizure impinge upon Mitchell's liberty interest, for unlike the luggage-seizure cases which typically involve interference with both a traveler's possessory interest and his "liberty interest in proceeding with his itinerary," Place, 462 U.S. at 708, Mitchell's freedom of movement was not impaired in any fashion.[14] "While the police are not free to dispossess an individual at will, they are subject to fewer restraining circumstances where they trammel no other recognized interest apart from that of possession alone." United States v. LaFrance, 879 F.2d 1, 6 (1st Cir. 1989). Nevertheless, the detention of Mitchell's hard drive pending issuance of a warrant to search that property is subject to the Fourth Amendment reasonableness standard. Id. The Court, therefore, must assess whether the government's delay was reasonable under the specific facts of this case.

The government seized Mitchell's hard drive after developing *probable cause* that it contained illegal contraband. Most of the "delay" cases cited by the parties address delays arising during investigatory

---

[14]Of course, some seizures of property within a residence could very well intrude upon a liberty interest, such as where agents seize keys to the homeowner's only vehicle or seize his plane ticket for a soon-departing flight.

seizures of closed containers based only on *reasonable suspicion* to believe the container encloses evidence of a crime. See, e.g., Place, 462 U.S. 696 (90-minute investigative detention of airport traveler's luggage on the basis of reasonable suspicion that it contained narcotics was unreasonable under the particular facts of the case); United States v. Van Leeuwen, 397 U.S. 249 (1970) (29-hour detention of mail packages on reasonable suspicion that they contained contraband did not violate the Fourth Amendment under the particular facts of the case); LaFrance, 879 F.2d at 8 (5¼-hour investigative detention of FedEx package pending arrival of drug dog was reasonable even though "the police may not have acted in the most expeditious manner" possible). Since such investigatory seizures, by their very nature, involve necessarily brief intrusions into possessory and (usually) liberty interests, they offer little assistance here. See United States v. Martin, 157 F.3d 46, 54 (2d Cir. 1998) ("Place does not control . . . [as] the seizure [of a UPS package] was based on probable cause, not mere suspicion."); United States v. Lewis, 902 F.2d 1176, 1180 (5th Cir. 1990) (same). The more relevant authorities are those few cases that have considered delay in seeking a warrant to search property seized on the basis

of probable cause.

Mitchell principally relies upon United States v. Dass, 849 F.2d 414 (9th Cir. 1989), where agents investigating a massive drug-smuggling scheme in Hawaii seized numerous packages from the mail after a drug dog signaled the presence of marijuana. The agents detained the packages for periods of 7 to 23 days before securing search warrants, which led to the discovery of marijuana in each package. Although it did not question the lawfulness of the initial probable cause seizure, the Ninth Circuit panel concluded that the delay in securing the search warrants violated the Fourth Amendment by substantially exceeding the 29-hour "outer boundary" of reasonableness established by the Supreme Court in Van Leeuwen. Id. at 415. In a vigorous dissent, Judge Alarcon faulted the majority for adopting a rigid "bright-line test" of reasonableness that directly contravened the Van Leeuwen Court's express instruction that the reasonableness of governmental delay is to be determined using a totality-of-the-circumstances analysis. Id. at 418 (Alarcon, J., dissenting). By adopting an "outer limit" standard, the majority insisted that the government act "ideally" rather than "reasonably," a Fourth Amendment

analysis specifically rejected by the Supreme Court.  Id. at 417.[15]

Judge Alarcon is correct: the Dass majority's holding simply cannot be reconciled with the Supreme Court's Fourth Amendment jurisprudence, which requires a flexible, case-by-case approach when assessing the reasonableness of government conduct under the Fourth Amendment.  By focusing on the fact that "the delays could have been much shorter" and insisting upon some absolute standard of governmental diligence, id. at 415, the majority in essence found that the delay was "unreasonable as a matter of law."  Id. at 416 (Alarcon, J., dissenting).  This "least intrusive means" approach to reasonableness has been condemned by the Supreme Court as an inappropriate standard for gauging the lawfulness of government conduct.  United States v. Sokolow, 490 U.S. 1, 10-11 (1989); United States v. Sharpe, 470 U.S. 675, 685-86 (1985) (Fourth Amendment imposes no bright-line limit on length of Terry stops); Place, 462 U.S. at 709 (declining

---

[15]Judge Alarcon noted the following "uncontested" facts never mentioned by the majority:  the 5 packages under review were seized "along with a group of more than 1,000 others" from 10 separate post offices; a drug dog alerted on an "overwhelming number" of the packages; task force agents elected to seek search warrants for 441 of the packages and return the rest to the mail in order to allay suspicion; and by processing the 441 warrant applications in only 23 days, the agents did so at "a rate of one warrant every 75 minutes!"  Id. at 416, 418.  Judge Alarcon commented that the officers' "remarkable achievement" and "valiant effort to comply with the fourth amendment should be commended—not rewarded with suppression of the evidence."  Id. at 418.

"to adopt any outside time-limitation for a permissible <u>Terry</u> stop" of luggage); <u>see</u> <u>LaFrance</u>, 879 F.2d at 5; 4 LaFave § 9.8(e), at 756-57. By adopting the very "bright-line" test that Mitchell concedes is an inappropriate measure of reasonableness, the <u>Dass</u> decision offers little support for Mitchell's position.[16]

A number of courts have employed the type of fact-specific analysis advocated by Judge Alarcon in assessing the reasonableness of governmental delay in securing a warrant following the lawful seizure of a container reasonably believed to conceal evidence of a crime.[17] In <u>Martin</u>, 157 F.3d 46, the Second Circuit upheld an eleven-day delay between the seizure of a UPS package based on the probable cause belief that it contained stolen airplane parts and the securing of a warrant to search that package. Although the court concluded that the cases considering brief, investigative seizures resting on reasonable suspicion alone were not

---

[16]Mitchell also relies upon <u>United States v. Puglisi</u>, 723 F.2d 779 (11th Cir. 1984), which held that the police offended the Fourth Amendment by detaining an airport traveler's luggage for 140 minutes while awaiting the arrival of a drug dog. Again, since <u>Puglisi</u> involved a necessarily "brief" investigatory detention based upon reasonable suspicion rather than a seizure resting upon probable cause, that case is distinguishable and does not aid the Court's analysis here.

[17]To the Court's knowledge, no other court has advocated the bright-line, "outer boundary" analysis employed by the <u>Dass</u> majority.

controlling, it nevertheless recognized that "even a seizure based on probable cause is unconstitutional if police act with unreasonable delay in securing a warrant." Id. at 54. The court found that "several factors" justified the delay in securing a warrant: (1) the eleven-day delay included two weekends and the Christmas holiday; (2) defendant had a diminished claim to Fourth Amendment privacy because he assumed the risk that the person who delivered the package to UPS would reveal the information to the authorities; (3) the seizure was necessarily less intrusive because control had been relinquished to a third party; and (4) the seizure did not restrain any liberty interest of defendant. Id. While noting that it would normally expect officers to secure a warrant "in considerably less time," under the particular circumstances of that case the court found that the delay "was not so 'unreasonable' as to violate the Fourth Amendment." Id.

In United States v. Jodoin, 672 F.2d 232 (1st Cir. 1982) (Breyer, J.), the court upheld a four-day delay between the seizure of a suitcase at an airport based on probable cause that it contained drugs and obtaining a warrant to search that container. The court noted that because the DEA agents had probable cause, it was not required to consider whether the

delay would have been justified if supported only by reasonable suspicion. Id. at 235. The court reached its decision by looking to all of the relevant facts rather than by applying some arbitrary, bright-line test of reasonableness.

In United States v. Gorshkov, 2001 WL 1024026 (W.D. Wash. May 23, 2001), FBI agents investigating Russian citizens suspected of hacking into the computer systems of American businesses accessed a computer located in Russia and downloaded certain files without reading them (a process that apparently took some eleven days to complete). Id. at *1. The agents did not apply for a warrant until eleven days later, a delay attributable to "the slow process" of obtaining FBI and Department of Justice approval. Id. After determining that the agents did not violate the Fourth Amendment by accessing the Russian computer and downloading the data, the Court concluded that the delay between the downloads and the issuance of the warrant was not unreasonable under the particular facts of the case. Id. at *4 n.3 (noting that because the data was merely copied, the delay had no "practical consequences" for defendant; there was an intervening Thanksgiving holiday; and the delay was occasioned by the

need for diplomatic notification of the appropriate Russian authorities).[18]

Looking to the totality of the circumstances in this case, the Court concludes that the government did not act unreasonably in delaying its application for a warrant to search the computer hard drive until after Agent West returned from his training seminar. Mitchell does not state what period of delay *would* have been reasonable in this case but simply suggests that a three-week delay was "plainly unreasonable." Nowhere does he contend that the Constitution required the government to apply for a search warrant either on the day of the seizure or within 24, 48, or any other precise number of hours after the seizure. Since the seizure occurred at approximately noon on Thursday, February 22, 2007, and since the

---

[18]The government places a great emphasis upon United States v. LaFrance, 879 F.2d 1 (1st Cir. 1989), which upheld the reasonableness of a 5¼-hour investigative detention of a FedEx package while agents located a drug dog, whose alert gave the agents probable cause to seize the package. While LaFrance is a "reasonable suspicion" case involving a necessarily brief seizure under the principles announced in Place, the court's analysis is particularly thorough and offers considerable support for the principle that reasonableness must be assessed by looking to all of the circumstances surrounding the seizure rather than by focusing on the mere duration of the delay. Id. at 4-6, 10 (noting that reasonableness is the measure under the Fourth Amendment, that the police are not required to "use the least intrusive means imaginable," and that the duration of a detention, while an important consideration, is not "the mirror image of unreasonableness nor the yardstick against which the suitability of police procedures must inevitably be measured"). In LaFrance, the "officers did not act with either military precision or ultimate dispatch—but they were not required to do so. Their choices, while not perfect, were acceptable." Id. at 10.

warrant application involved the preparation of a detailed, 21-page affidavit[19] that had to be reviewed and edited by an Assistant United States Attorney before its presentation, the Court has no difficulty concluding that the government would have acted reasonably in waiting until the following Monday (February 26) to seek a search warrant. This is particularly true given Mitchell's frank admission that the hard drive contained "illegal" child pornography. While the Court does not accept the government's contention that the admission eliminated "all danger" of unfairly depriving Mitchell of possession of property in which he had a lawful interest, doc. 23 at 13, such an admission significantly curtailed the strength of Mitchell's possessory claim. But although the admission did not eliminate Mitchell's potential possessory interest entirely, it is a relevant factor in assessing the reasonableness of the government conduct in this case. See Martin, 157

---

[19]Mitchell emphasizes the "cut and paste" nature of the affidavit, noting that much of its language was not the original work product of Agent West but had been copied from affidavits used by the New Jersey ICE agents who initiated the investigation. Mitchell, however, too easily minimizes the effort required to locate those affidavits, study their contents, identify and lift the applicable language, and submit the affidavit for proofreading by an AUSA, who ultimately authorized its presentation to the Court. Such customization of a previously used affidavit, particularly one of this length, is not always a simple matter. In any event, defendant never disputes that it would have taken the government at least a few days to prepare, review, and present its application for the search warrant.

F.3d at 54 (the strength of the property owner's Fourth Amendment interest is a pertinent factor).

Even though the government was not required to immediately seek a warrant (and Mitchell does not contend otherwise), it is certain that the government could have secured a warrant much sooner than it did. Although Agent West departed Savannah on February 25 to attend a pre-scheduled training program and therefore was unavailable for a two-week period, the FBI agent who accompanied West to Mitchell's residence could have secured a warrant during West's absence. (The government has never contended that Special Agent Hayes was unfamiliar with the background of the child pornography investigation or, if he was, that he could not have acquired sufficient knowledge to prepare a search warrant affidavit.) But what would this have accomplished? Agent Hayes would have secured a search warrant that he personally could not have executed for lack of the necessary expertise. Tr. at 20-23. Further, had Hayes enlisted the services of the FBI's in-house computer forensics experts, the search likely would not have occurred until many months later. Tr. at 20.[20] Thus, regardless

---

[20]During the hearing, Mitchell's counsel elicited testimony that both the local city police and the GBI have their own computer personnel. There is no evidence in the

of when the search warrant issued, the earliest possible date for conducting a search of Mitchell's hard drive was after Agent West returned to Savannah from his training seminar. The first work-day following his return was Monday, March 12, 2007, just three days prior to the March 15th issuance of the warrant. Since no search would have occurred before Agent West returned to Savannah, Mitchell would have had no right to re-acquire his property (assuming it contained no contraband) prior to the week of March 12, 2007.

Most of the cases relied upon by the parties share a common feature: the issuance of a warrant allows an *immediate* search of the closed container, for it generally takes no special skill or training to open a suitcase or a mailed package or a box in order to examine the contents. But it is not inevitably the case that securing a warrant will permit the prompt search of the seized property, for particularly with respect to computers, it often takes considerable time to secure the services of a person with the necessary expertise to conduct the search, and it often takes considerable

_____

record, however, that any of those experts were available or even willing to conduct a prompt search of Mitchell's computer, or even that the federal agents were authorized to enlist the services of the police or GBI in a matter of this kind.

time for such an expert to analyze a storage device containing many gigabytes of data (equivalent to an entire library of documents). Nor does the Fourth Amendment or Fed. R. Crim. P. 41 require such promptness. The Fourth Amendment "contains no requirements about *when* the search or seizure is to occur or the *duration*." United States v. Gerber, 994 F.2d 1556, 1559 (11th Cir. 1993). Many courts have recognized the unique nature of computer searches, the computer's enormous data storage capacity, and the inherent delay involved in conducting a comprehensive forensic analysis of computer records. See, e.g., United States v. Triumph Capital Group, Inc., 211 F.R.D. 31, 66 (D. Conn. 2002) (noting that "computer searches are not, and cannot be subject to any rigid time limit because they may involve much more information than an ordinary document search"); United States v. Hernandez, 183 F. Supp. 2d 468, 480 (D. P.R. 2002) (noting that "[n]either Fed. R. Crim. P. 41 nor the Fourth Amendment provides for a specific time limit in which a computer may undergo a government forensic examination after it has been seized pursuant to a search warrant," and where delay occurs "extensions or additional warrants are not required."); see also United States v. Maali, 346

F. Supp. 2d 1226, 1242, 1246-47 (M.D. Fla. 2004) (finding that warrants should be read with flexibility in light of the complexity of the material sought).

As noted earlier, the purpose of securing a warrant soon after a suspect is dispossessed of his closed container is to reinstate his possessory interest in property that is ultimately determined to be free of any contraband or incriminating evidence. But under the particular circumstances of this case, the prompt issuance of a search warrant would not have facilitated this objective. Even if a warrant had been secured during Agent West's absence, there would have been no execution of that warrant prior to his return. And even if Agent West had secured a warrant on the day of the hard drive's seizure, his evaluation of that hard drive would not have been completed prior to his departure for the two-week training program, for given the thousands upon thousands of images and the numerous video files stored on Mitchell's hard drive, it took Agent West two weeks to complete his evaluation of only *some* of the images. Tr. at 86-87 (where Agent West testified that if he had gone through all of the images "it probably would have taken another two to three weeks"). Thus, as

Agent West properly concluded, there was no urgency in securing a search warrant since the necessarily lengthy examination of Mitchell's hard drive would not have occurred until the agent's return. Tr. at 18-20. The delay prior to March 12, 2007, therefore, had no practical effect upon Mitchell's rights, for his possessory interest would not have been restored prior to March 12, 2007.

The Court further concludes that the government did not act unreasonably in waiting a few days after Agent West's return before applying for a search warrant. The Court does not doubt that the government failed to act in the most expeditious manner possible by waiting until the fourth work-day after West's return before seeking a warrant. The Constitution, however, requires reasonableness, not perfection. "The question is not simply whether some alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." United States v. Sharpe, 470 U.S. at 686-87; LaFrance, 879 F.2d at 4-5; Dass, 849 F.2d at 417-18 (Alarcon, J., dissenting). Since Agent West had just returned from a two-week seminar and had yet to complete his affidavit (which he began to draft during his spare time while

at the seminar) or have it reviewed by AUSA Marsh, and since a forensic examination of the hard drive would likely (and did) take several weeks, the Court finds that the government acted reasonably, although by no means perfectly, in waiting until March 15, 2007 to apply for the warrant.

## III. CONCLUSION

Under the particular circumstances of this case, the agents did not violate the Fourth Amendment by either seizing Mitchell's computer hard drive without a warrant or by waiting twenty-one days before applying for a warrant to search that hard drive. Accordingly, Mitchell's motion to suppress should be DENIED.

**SO REPORTED AND RECOMMENDED this** 3rd **day of October, 2007.**

_____
**UNITED STATES MAGISTRATE JUDGE**
**SOUTHERN DISTRICT OF GEORGIA**